UNITED STATES of America, Appellee,

v.

Anthony Frank GAGGI, Henry Borelli, Peter LaFroscia, Ronald Ustica, Edward Rendini and Ronald Turekian, Defendants-Appellants.

Nos. 164 to 169, Dockets 86–1171 to 86–1174 and 86–1184 to 86–1186.

United States Court of Appeals, Second Circuit.

Argued Oct. 6, 1986.

Decided Jan. 21, 1987.

Judd Burstein, Michael Rosen, New York City (Judd Burstein, Edward M. Chikofsky, New York City, of counsel), for defendant-appellant Anthony Gaggi.

Herald Price Fahringer, New York City (Robert L. Ellis, Edward M. Chikofsky, Judd Burstein, New York City, of counsel), for defendant-appellant Edward Rendini.

Robert L. Ellis, New York City, submitted joint brief for defendant-appellant Henry Borelli.

Joel Winograd, New York City, submitted joint brief for defendant-appellant Peter LaFroscia.

Edward M. Chikofsky, New York City, submitted joint brief for defendant-appellant Ronald Ustica.

Judd Burstein, New York City, of counsel on joint brief, for defendants-appellants.

David S. Greenfield, New York City (Jonathan J. Silbermann, New York City, of counsel), submitted brief for defendant-appellant Ronald Turekian.

Mary Lee Warren, Asst. U.S. Atty., S.D. N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Michael Kellogg, Walter S. Mack, Jr., Warren Neil Eggleston, Asst. U.S. Attys., S.D.N.Y., of counsel), for appellee, U.S.

Before CARDAMONE and PIERCE, Circuit Judges, and BONSAL, District Judge.[*]

**CARDAMONE, Circuit Judge:**

This appeal presents a trial record of a malevolent group of defendants, in the accomplishment of whose violent conspiracies no one was suffered to stand in the way. The problems raised by their trial are varied and complex, not merely on account of the number of those accused, but because two events—one unexpected, one designed—complicated the proceedings immeasurably. Unanticipated was the mur-

---

[*] Hon. Dudley B. Bonsal, Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

der of defendant Paul Castellano on the streets of New York City, during the trial. The planned action was the government's decision to indict two defendants for conspiracy to murder two "persons" under a statute originally enacted in 1870 to protect citizens from discrimination. Although there is no charge that constancy be Congress' guiding star, it has for over 115 years steadfastly resisted all attempts to change the meaning of the word "citizen".

## BACKGROUND

Defendants Anthony Gaggi, Henry Borelli, Peter LaFroscia, Ronald Ustica, Ronald Turekian and Edward Rendini appeal their judgments of conviction entered in the United States District Court for the Southern District of New York (Duffy, J.) on April 9 and 11, 1986, after a five and one-half month jury trial. On October 4, 1984, the government filed a 78-count indictment naming 24 defendants and alleging 11 different conspiracies. On September 9, 1985, Judge Duffy severed the indictment for the separate trials.[1] The trial at issue on this appeal comprises 23 counts of the original indictment relating to the defendants' stolen car ring involving ten individuals, six of whom are the defendants presently before us.[2]

The six defendants were variously charged with and convicted of one or more violations of 18 U.S.C. §§ 241, 371, 1341 and 2314. Section 371 makes illegal a conspiracy to transport stolen property in interstate and foreign commerce, and § 2314 proscribes the substantive crime of actually transporting such property. Section 241 makes it a crime to deprive any citizen of any right or privilege guaranteed by the Constitution or laws of the United States. Finally, § 1341 proscribes frauds perpetrated through the use of the United States mails.

The defendants, the various crimes with which they were charged, and the dispositions of the charges are as follows. The conspiracy under § 371 charged defendants with combining to ship late-model automobiles stolen on the streets of New York to Kuwait and other parts of the Middle East, Puerto Rico and other states in the United States. Gaggi, Ustica, LaFroscia, Rendini and Turekian were convicted of this conspiracy. Ustica, Borelli and Rendini were also convicted on a number of § 2314 counts; while Gaggi, LaFroscia and Turekian were acquitted on these counts. Borelli and Ustica were additionally convicted of conspiracy to deny citizens their civil rights in violation of § 241 for the murders of Ronald Falcaro and Khaled Fahd Darwish Daoud. Finally, Turekian was convicted of mail fraud in violation of § 1341 for submitting fraudulent claims to Aetna Insurance Company. An appendix included at the end of the opinion shows the charges for which each defendant was indicted, whether the charge resulted in a conviction or an acquittal, and the sentence imposed.

Two of the six issues raised have already been alluded to—the effect of publicity generated by a murder during trial and the conspiracy to commit murder. For organizational purposes the issues raised by appellants will be discussed in the following order: (I) publicity during trial, (II) civil rights murder conspiracy, (III) government's claimed misconduct under *Brady* and *Mooney*, (IV) evidentiary contentions, (V) jury instructions, and (VI) sentences.

## DISCUSSION

### I *The Publicity During Trial*

Two deaths occurred at different times during this lengthy trial prompting motions for mistrial, which were denied on each occasion. Appellants argue that the continued impartiality of the jury was destroyed

---

1. The case originally was assigned to District Court Judge Sofaer. *See United States v. Castellano*, 610 F.Supp. 1359 (S.D.N.Y.1985).

2. The other four named defendants were Joseph Testa and Anthony Senter, both acquitted by the

jury, Richard Mastrangelo acquitted by the trial court at the close of the government's case, and Paul Castellano, whose murder during the trial is one of the principal issues raised on appeal.

by these events, and they urge further that the measures taken by the district court were inadequate to protect their rights to a fair trial.

It is not an uncommon occurrence for a notorious trial held in Metropolitan New York to engender extensive publicity. The strong public interest in such trials has resulted in procedures to protect defendants' rights to a fair trial. In *United States v. Lord,* 565 F.2d 831 (2d Cir.1977), we established guidelines for a district court to follow when the problem of widely disseminated publicity may prejudicially impact an ongoing criminal trial. The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors— outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly. *Id.* at 838–39. Ultimately, the trial judge must examine the " 'special facts' " of each case, *United States v. Persico,* 425 F.2d 1375, 1382 (2d Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970) (quoting *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959) (per curiam)), to determine whether the jurors remained impartial. *United States v. Gigante,* 729 F.2d 78, 82 (2d Cir.), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984). Absent a clear abuse of the trial court's discretion, its finding that the jury was impartial should be upheld. *United States v. Moon,* 718 F.2d 1210, 1219 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984); *see Marshall,* 360 U.S. at 312, 79 S.Ct. at 1172 (trial judge has large discretion in ruling on the issue of prejudice resulting from publicity). With these standards in mind, we turn to the events that occurred during trial and the safeguards taken by the district court.

### A. The Murder of Paul Castellano

On December 16, 1985 two and one-half months into the trial, Paul Castellano—the lead-named defendant in the indictment and one of the named defendants on trial—was gunned down and killed in mid-town Manhattan while out on bail. Almost immediately news of the murder appeared in virtually every newspaper, radio, and television report in New York City. Two leading newspapers reported the incident, for example, as *Mafia's Number One Blown Away,* N.Y. Post, Dec. 17, 1985 at 2 and *Organized-Crime Chief Shot Dead Stepping From Car on E. 46th St.,* N.Y. Times, Dec. 17, 1985 at A1, col. 2. The reports of this killing and subsequent investigation did not subside for several weeks. Appellants contend, as they did below, that the jury's exposure to the concededly broad media coverage of this event required a mistrial.

The day after Castellano's death Judge Duffy conducted a separate *voir dire* of each juror, asking a number of questions regarding what, if anything, the juror had heard or seen about the murder. All of the jurors knew of it, and approximately six also had heard that Castellano had been a head of an organized crime family. None had heard any comments regarding the nine remaining defendants or about the trial, except that Castellano was a defendant before them. All of the jurors stated that they would be able to decide the case fairly and impartially. *United States v. Gaggi,* 632 F.Supp. 1019, 1020–21 (S.D.N.Y. 1986).

Following arguments heard January 6, 1986, on defendants' motion for mistrial, Judge Duffy found that the publicity had "a potential for unfair prejudice," and therefore conducted a second individual *voir dire* of each juror, including questions suggested by defense counsel. *Id.* at 1021–22. The trial court concluded that the publicity was collateral in nature, and specifically found that none of the jurors had heard or read anything concerning the remaining defendants. All of the jurors stated unequivocally that their judgment would

not be affected by the media reports and that they could decide the case solely on the evidence presented. *Id.* at 1022–23. As a result, the court ruled—based in part on the jurors' responses and in part on its own assessment of the jurors' awareness of their responsibilities and obligations— that the jury had not been prejudiced by the media reports.

■ The record thus reveals that the trial court complied in every respect with this Circuit's guidelines. For instance, in *Lord*, we held that the district court should not rely solely on repetitive admonitions when widespread publicity created a strong possibility that some jurors might have been exposed to prejudicial publicity. 565 F.2d at 838. In contrast, the district court here took prompt and effective corrective action. Once it saw "a potential for unfair prejudice," it held, not one but two, *voir dires* of each juror outside the presence of other jurors, to determine the extent of the juror's exposure to the reports and its effect on his or her attitude toward the remaining defendants. Under these circumstances, the measures taken by the district court were adequate to insure a fair trial.

Nevertheless, appellants, relying on *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam) and its progeny, insist that given the scope and intensity of the media coverage and despite the precautions taken, nothing short of a mistrial could have preserved their fair trial rights. Appellants stress in particular that the district court had been especially careful throughout the trial to avoid the introduction of references to the "Mafia", "Gambino family", and "organized crime". That precaution was shattered, appellants contend, by the jurors' exposure to those references in the media reports following Castellano's murder. We cannot agree.

■ It is the impartiality of the jurors— not the quantum of publicity—that determines whether the trial proceedings may be fairly conducted. *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Further, while appel-

lants correctly observe that the jurors were exposed to references that Judge Duffy had properly sought to avoid, they fail to demonstrate how these concerns were not ameliorated by the two individual *voir dires*. As the Supreme Court has cautioned, "the Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation.' " *Rushen v. Spain*, 464 U.S. 114, 118, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (per curiam) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982)); *see United States v. Williams*, 568 F.2d 464, 470 (5th Cir.1978) ("Obviously, reversal is not required in every case in which a news story containing facts inadmissible in evidence reaches the jury.").

*Marshall* is inapposite. There the Supreme Court held that the jurors' exposure to media coverage regarding the defendant's *own* prior criminal conviction, which the trial court had ruled was inadmissible because of its prejudicial effect, mandated a new trial despite assurances by the jurors that they would not be influenced by the information. 360 U.S. at 312–13, 79 S.Ct. at 1172–73. Years later, the Supreme Court restated the *Marshall* rationale as: "persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced." *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). Here the district court made a clear finding that not a single juror had been exposed to information regarding the remaining defendants, and that the publicity therefore was collateral in nature. On that basis it concluded that the jurors were capable of deciding the issues before them fairly and impartially. Appellants' counsel conceded at oral argument that the publicity generated by the Castellano murder did not relate directly to the issues at stake in the ongoing trial. In contrast with *Marshall*, the publicity in the instant case did not relate to the remaining defendants' guilt with respect to the charges against them. The trial court took prompt action to determine

the effect of that publicity and gave the jury repeated cautionary instructions. *See Gigante,* 729 F.2d at 82. Because the trial court is in a much better position to assess the partiality of a juror, it is inappropriate for an appellate court to second-guess that face to face appraisal.

### B. *The Death of Frederick DiNome*

On February 17, 1986, about two months after Castellano's death—after the trial had been concluded and while the jury was deliberating—there were news reports detailing the apparent suicide of Frederick DiNome, one of the government's major witnesses who had testified earlier in the trial. As a result, defense counsel again moved for a mistrial or, alternatively, an individual *voir dire* of the jurors. The district court denied these applications and conducted instead a general inquiry of the jury. In response to the question whether any of them had seen a newspaper that day, the jurors responded by shaking their heads "no". The court then emphasized repeatedly that they were to avoid media reports "at all costs." The trial judge believed that a deeper inquiry would only "fuel speculation" and "distract the jurors" from their deliberations. 632 F.Supp. at 1024.

■ Appellants now argue that the district court abused its discretion by not examining each juror individually. In support of this argument they mistakenly rely upon cases in which actual exposure to demonstrated prejudicial publicity required the district court to conduct an individualized *voir dire* of the jury. *See, e.g., United States v. Betner,* 489 F.2d 116, 118 (5th Cir.1974). *United States v. Rattenni,* 480 F.2d 195, 197 (2d Cir.1973); *United States ex rel. Owen v. McMann,* 435 F.2d 813, 815 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971); *United States v. Kum Seng Seo,* 300 F.2d 623, 624 (3d Cir.1962); *Coppedge v. United States,* 272 F.2d 504, 507–08 (D.C.Cir.1959), *cert. denied,* 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961); *United States v. Titsworth,* 422 F.Supp. 587, 589–90 (D.Neb.1976). Yet, appellants also point to *Lord* where only a "strong possibility" of exposure existed, 565 F.2d at 838, and where we noted that in such cases something more than mere admonitions was required. *Id.* Here, the district court did "something more". It conducted a general inquiry satisfying itself that no actual jury exposure to prejudicial information had occurred. Thus, under our three-step process an individualized *voir dire* was unnecessary.

■ Moreover, we agree with the district court, 632 F.Supp. at 1024, that the jury's ability to render an impartial verdict is confirmed by the care which it took in its deliberations. *See United States v. Aiello,* 771 F.2d 621, 631 (2d Cir.1985); *Gigante,* 729 F.2d at 82. Deliberations continued from February 13 through March 5, 1986. The jury made 56 requests asking for re-readings of testimony, exhibits, stipulations, and instructions. Its verdict "ran the gamut" with 58 findings of guilty, 90 findings of not guilty, and a deadlock on two defendants on one count. 632 F.Supp. at 1024. Such a record reveals both an impartial and meticulous jury. Hence, we see no reason to disturb the district court's discretion in refusing to make more than a general inquiry regarding DiNome's death.

### II *The Civil Rights Conspiracy*

■ Appellants Borelli and Ustica were convicted under 18 U.S.C. § 241 (1982) of conspiracy to deprive Ronald Falcaro and Khaled Fahd Darwish Daoud of the right to be federal witnesses. The jury found that the conspiracy caused the death of both men. Appellants claim that § 241 applies only to conspiracies to deny citizens their constitutional rights, and that Falcaro and Daoud were not proven to be citizens beyond a reasonable doubt. Consequently, they maintain that there is insufficient evidence as a matter of law to sustain their convictions. The government responds that the district court properly ruled that this statute does not limit its protection to citizens. For the reasons that follow, we conclude that United States citizenship is a necessary element under § 241.

### A. *Language of § 241*

"Federal crimes, of course, 'are solely creatures of statute.'" *Dowling v. United States*, 473 U.S. 207, 213, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985), (quoting *Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985)). For this reason, when analyzing the range of a federal criminal statute close heed must be paid to its language, construction, legislative history, and purpose in order to determine the scope of conduct the enactment forbids. The best starting point for examination of § 241 is—as that familiar canon of statutory construction instructs—the language of the statute itself. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Entitled "Conspiracy against rights of citizens", § 241 makes it unlawful for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any *citizen* in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States...." 18 U.S.C. § 241 (1982) (emphasis added). The statute specifically protects "citizens" against interference with their constitutional or federal statutory rights. Its language does not address harm aimed at "persons", "inhabitants", "residents", or "domiciles". When called upon to construe this statute, the Supreme Court stated that "§ 241 must be read as it is written." *United States v. Price*, 383 U.S. 787, 798, 86 S.Ct. 1152, 1159, 16 L.Ed.2d 267 (1966). As a matter of common usage the term "citizen" is properly understood as a native or naturalized person who owes allegiance to a government and who is entitled to reciprocal protection from it. Thus, "[f]ollowing the axiom that words used in a statute are to be given their ordinary meaning," *Burns v. Alcala*, 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975), (citing *Minor v. Mechanics Bank*, 26 U.S. 46, 63, 1 Pet. 46, 64, 7 L.Ed. 47 (1828)), § 241 is plainly limited by its language to redressing conspiracies against citizens.

### B. *Judicial Construction of § 241*

As the Supreme Court has observed, inquiry into the proper construction of a statute does not necessarily end after ascertaining the plain meaning drawn from the face of the statute. *Watt v. Alaska*, 451 U.S. at 266, 101 S.Ct. at 1677; *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976). An examination of the caselaw construing § 241 is also appropriate.

A century ago, the Supreme Court answered the precise question before us today. In *Baldwin v. Franks*, 120 U.S. 678, 7 S.Ct. 656, 32 L.Ed. 766 (1887), the Court had before it a charge under § 241's identical predecessor statute based on a conspiracy to drive certain Chinese aliens from their California residences. Because the conspiracy was aimed at "alien" victims, the question arose: Who are the citizens of the United States to which the statute refers? The Supreme Court concluded: "it is everywhere apparent that Congress had it in mind to legislate for citizens, as citizens, and not as mere persons, residents or inhabitants." *Id.* at 691, 7 S.Ct. at 662. *See also Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 661–62 n. 36, 99 S.Ct. 1905, 1939 n. 3, 60 L.Ed.2d 508 (1979) (White, J. concurring) (discussing *Baldwin*); *United States v. Williams*, 341 U.S. 70, 81 n. 7, 71 S.Ct. 581, 586 n. 7, 95 L.Ed. 758 (1951) (Frankfurter, J.) (reiterating the holding of *Baldwin*). The *Baldwin* court further explained:

This section is highly penal in its character,.... It is, therefore, to be construed strictly; ... doubtful words are not to be extended beyond their natural meaning in the connection in which they are used. Here the doubtful word is "citizen", and it is used in connection

with the rights and privileges pertaining to a man as a citizen, and not as a person only or an inhabitant.... For these reasons we are satisfied that the word citizen, as used in this statute, must be given the same meaning it has in the Fourteenth Amendment of the Constitution, and that to constitute the offense which is there provided for, the wrong must be done to one who is a citizen in that sense.

120 U.S. 691–92, 7 S.Ct. 662.

Thus, the Supreme Court believed that since § 241 had been enacted in the wake of the Fourteenth and Fifteenth Amendments, it must be interpreted consistently with those Amendments. Section 1 of the Fourteenth Amendment defines "citizen" as "all persons born or naturalized in the United States". U.S. Const. amend. XIV, § 1. Reading the Fourteenth Amendment alongside *Baldwin*, we are persuaded that Congress meant to restrict prosecutions under § 241 to conspiracies against persons born or naturalized in the United States.

Moreover, in the 100 years that have passed since its original pronouncement, the Supreme Court has not seen fit to alter the view it expressed in *Baldwin*. In fact, not a single court—with the exception of the district court here—has held that the victim of a § 241 conspiracy need not be a "citizen". Instead, every court considering this issue has either stated or assumed that American citizenship is an element of proof under the statute. *See, e.g., United States v. Harris*, 701 F.2d 1095, 1102 (4th Cir.), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983); *United States v. King*, 587 F.2d 209, 211 (5th Cir.) (per curiam), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979); *Wilkins v. United States*, 376 F.2d 552, 561 (5th Cir. 1967); *Powe v. United States*, 109 F.2d 147, 149 (5th Cir.), *cert. denied*, 309 U.S. 679, 60 S.Ct. 717, 84 L.Ed. 1023 (1940); *United States v. Patrick*, 54 F. 338, 342–43 (C.C.M.D.Tenn.1893); *United States v.*

*Wheeler*, 254 F. 611, 624 (D.Ariz.1918), *aff'd on other grounds*, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270 (1920). Thus, in addition to the plain language of the statute itself, Supreme Court precedent requires an offense under § 241 to be committed against one who is a citizen.

### C. *Legislative History*

The legislative history of § 241 further confirms our view concerning the proper construction of the statute. The section began its long history as § 6 of the Act of May 31, 1870, 16 Stat. 140, entitled "An Act to enforce the Right of Citizens of the United States to vote in the several States of this Union, and for other Purposes." *See United States v. Williams*, 341 U.S. 70, 73, 71 S.Ct. 581, 582, 95 L.Ed. 758 (1951). That Act, later known as the Enforcement Act of 1870, was passed only two months after the ratification of the Fifteenth Amendment. In addition to the new § 241, the Enforcement Act of 1870 included a re-enactment of § 17 of the Civil Rights Act of 1866, 14 Stat. 27, which today is § 242. *See Price*, 383 U.S. at 801–02, 86 S.Ct. at 1160–61. We recognize that originally the chief purpose of § 241 was to provide sanctions against interference with the right of Black citizens to vote, recently guaranteed them by the Fifteenth Amendment and to protect the exercise of that right against hostile groups, particularly the Ku Klux Klan. *See Williams*, 341 U.S. at 76, 89, 71 S.Ct. at 584, 591 (Douglas, J., dissenting). On the other hand, the genesis of § 242 derived, at least in part, from a desire to protect immigrant Chinese laborers from rampant discrimination aimed at them in California. *See United States v. Otherson*, 637 F.2d 1276, 1282, 1284 (9th Cir.1980), *cert. denied*, 454 U.S. 840, 102 S.Ct. 149, 70 L.Ed.2d 123 (1981). In fact, Senator Stewart of Nevada in discussing the extension of the predecessor of § 242 to protect aliens,[3] explained: "The civil rights bill had

---

**3.** Specific language in § 242, originally § 2 of the Civil Rights Act of 1866, was added in its re-enactment in the Enforcement Act of 1870

which made discrimination based on alienage an additional offense. *Compare* § 17 of the Act of May 31, 1870, 16 Stat. 144, *with* § 2 of the Act

several *other things applying to citizens* of the United States. This simply extends to foreigners, *not citizens,* the protections of our laws where the State laws deny them ... equal civil rights." *Cong. Globe,* 41st Cong., 2d Sess. 1536 (1870), *quoted in Otherson,* 637 F.2d at 1282 (emphasis added). Thus, it was Congress' purpose from the outset in enacting §§ 241 and 242 to address distinct evils aimed at different groups—one citizens, the other inhabitants—residing in the United States.

After the 1870 Act, what is now § 241 remained essentially unchanged. It next appeared in the Revised Statutes of 1874–1878 as § 5508, which was carried as § 19 without change into the Criminal Code of 1909, 35 Stat. 1092. In 1926, § 19 became § 51, 44 Stat. 462. The present day § 241 came from Title 18, United States Code Revisions of 1948. In none of the revisions or subsequent re-enactment is there any evidence of a congressional aim to alter the original scope of § 241. *Price,* 383 U.S. at 803, 86 S.Ct. at 1161. As Justice Frankfurter remarked in comparing § 241 with § 242: "To find this significance in the text of the Act of 1870 is not to give undue weight to differences in phraseology appearing in the statute. For the text of these sections has been considered by Congress not once but five times." *Williams,* 341 U.S. at 79, 71 S.Ct. at 585. By its repeated reenactments of § 241 without substantive change after its judicial construction in *Baldwin,* Congress is presumed to have adopted that interpretation. *See Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 869, 55 L.Ed.2d 40 (1978); *Baldwin,* 120 U.S. at 691, 7 S.Ct. at 662. Hence, Congress' original purpose "of securing and protecting the liberty of the citizen and the rights and immunities of American citizenship" remains the touchstone of § 241 today. *See Cong. Globe,* 41st Cong., 2d Sess., pp. 3611–3613 (Remarks of Senator Pool of North Carolina

on sponsoring Section 6 of the Enforcement Act of 1870), *cited in* the Appendix to *Price,* 383 U.S. at 807, 812, 86 S.Ct. at 1163, 1166.

If there be doubt that the word "citizen" refers only to those who are citizens of the United States, a comparison of § 241 with § 242 aids in dispelling it. The two sections were enacted together in *pari materia;* § 242 makes it unlawful to "willfully subject[ ] [under color of law] any *inhabitant* ... to the deprivation of any rights, privileges, or immunities ... or to different punishments, pains, or penalties, on account of such *inhabitant being an alien,* or by reason of his color, or race, than are prescribed for the punishment of *citizens.*" 18 U.S.C. § 242 (emphasis added). In enacting these two statutes at the same time, Congress expressly limited § 241 to "citizens"; but extended § 242's protection to "inhabitants".[4] We presume that the use of different terminology within a body of legislation evidences a Congressional purpose to differentiate. *See Lankford v. Law Enforcement Assistance Administration,* 620 F.2d 35, 36 (4th Cir.1980); *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972) (per curiam).

When referring to the predecessors of §§ 241 and 242, the Supreme Court noted this difference: "Section 19 [241] protects the 'citizen'; § 20 [242] the 'inhabitant'." *Williams,* 341 U.S. at 87, 71 S.Ct. at 591 (Douglas, J., dissenting). Other circuit courts have also acknowledged the distinction. For example, in *United States v. King,* the Fifth Circuit, holding that a jail inmate was a "citizen" within the meaning of the statute, announced: "Section 241 protects citizens, whereas § 242 protects inhabitants." 587 F.2d at 211. Consequently, nothing in the language of § 241 or in its neighboring provisions of the same Title, supports the government's claim that § 241 encompasses conspiracies against in-

---

of April 9, 1866, 14 Stat. 27, both of which can be found in the Appendix to Opinion of Frankfurter, J., *United States v. Williams,* 341 U.S. at 83, 71 S.Ct. at 588, which carefully traces the successive phraseology of §§ 241 and 242.

**4.** For the historical development of the term "inhabitant" and the origins of 18 U.S.C. § 242, see *United States v. Otherson,* 637 F.2d 1276, 1279–85 (9th Cir.1980).

dividuals who are not citizens. On the contrary, a comparison of § 241 with § 242 demonstrates the opposite; that when Congress used the word "citizen", it intended no other meaning than that imparted by its choice of that term.

In fact, Congress has recently acknowledged the continuing vitality of the "citizen-inhabitant" distinction made in §§ 241 and 242. In 1980, the Senate Judiciary Committee issued—as part of its many proposed reforms to the Criminal Code—a report detailing recommendations to amend §§ 241 and 242. S.Rep. No. 553, 96th Cong., 2d Sess. 461 (1980). Although the Committee's recommendations were not enacted into law, the report illustrates the narrow limits of prosecution under § 241 and, as a result, reinforces our conclusion.

In describing its proposed consolidation of §§ 241 and 242, the Committee remarked: "The former statute has been recast to protect all persons rather than just citizens." *Id.* It explained:

> The Committee has also somewhat expanded the reach of section 241 by eliminating the restriction that the victim be a "citizen." Instead, the citizen or non-citizen status of the victim will be irrelevant. The focus will be on the nature of the right, privilege, or immunity involved; if it is one secured by the Constitution or laws of the United States, the proposed statute will come into play. To be sure, cases in which the non-citizen status of the victim has prevented successful prosecution are few. The Committee, though, sees no reason for maintaining the limitation in view of the fact that aliens in this country are protected by an abundance of Federal constitutional and statutory provisions, and hence are likewise deserving of protection, by the operation of penal sanctions, against persons who deliberately seek to deprive them of those rights. Significantly, 18 U.S.C. 242 does not appear to be limited to a citizen-victim.

*Id.* at 464 (footnotes omitted). Despite the proposed amendment's lack of success in the 96th Congress, a similar bill, one which carried over the proposed unenacted language, was introduced in the next Congress. S.1630, 97th Cong., 1st Sess. § 1501 Cong.Rec. (1981). The purpose of this bill also was to expand the reach of § 241 by eliminating the restriction that the victim be a "citizen". S.Rep. 307, 97th Cong., 1st Sess. 489, 492 (1981). Once again the attempt to broaden § 241 failed. In fact, a later proposed amendment took out the "person" language and reinstated the original more restrictive "citizen" language of the present § 241. Amend. No. 1351 to S.1630, 128 Cong.Rec. 88 (1982). The original Senate bill and the proposed amendment to it were never enacted.

Thus, Congress has many times considered and each time *ultimately rejected* the exact expansion of § 241 sought by the government in this case. Consequently, we decline to amend this statute under the guise of construing it when Congress has refused. *See Fedorenko v. United States,* 449 U.S. 490, 513, 101 S.Ct. 737, 750, 66 L.Ed.2d 686 (1981).

### D. *Government Arguments*

■ Although we have set forth our view in some detail, the government has made two arguments that deserve further comment. First, while acknowledging *Baldwin's* holding that the word "citizen" in § 241 must be given the same meaning it has in the Fourteenth Amendment, the government, citing *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), points to the fact that the Fourteenth Amendment's protections have been applied to aliens since the *Baldwin* decision. Therefore, the government argues, under *Baldwin* itself the word "citizen" must now include "aliens". A close reading of *Plyler* reveals that the government's reliance is misplaced. That case held essentially that an alien is a "person" as that term is used in the equal protection clause of the Fourteenth Amendment. 457 U.S. at 210–16, 102 S.Ct. at 942–45. It did not address the meaning of the word "citizen". In fact, both the equal protection and due process clauses, which in the recent past have been held to protect the rights of

aliens present in this country, use the term "person". U.S. Const. amend. XIV, § 1. But, at the same time, the citizenship and the privileges and immunities clauses relied on by the Supreme Court in *Baldwin*, 120 U.S. at 690, 7 S.Ct. at 661, define and use the term "citizen". In short, the government's argument simply fails to recognize that the Fourteenth Amendment itself distinguishes between "persons" and "citizens".

■ Further, even were the strength of this distinction less apparent, a time-honored tenet of statutory construction directs that a court called upon to apply an ambiguous penal statute should not construe it in favor of sanctions, but strictly in favor of lenity. *See, e.g., Dowling*, 473 U.S. at 213–14, 105 S.Ct. at 3132; *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); *United States v. Campos-Serrano*, 404 U.S. 293, 299, 92 S.Ct. 471, 475, 30 L.Ed.2d 457 (1971) ("The principle of strict construction of criminal statutes demands that some determinate limits be established based upon the actual words of the statute."); *United States v. Margiotta*, 688 F.2d 108, 120 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

Finally, the government urges as a matter of policy that aliens who serve as federal witnesses should be entitled to reciprocal federal protection. But the protections of § 241 do not extend to non-citizens, however salutary such an extension may be. The problem—being statutory, and not constitutional—has been and presently is still subject only to congressional remedy. Consequently, while as a matter of policy such a change may be desirable, it is for Congress and not this Court to effectuate. *See Baldwin*, 120 U.S. at 692, 7 S.Ct. at 662. Thus, for the reasons discussed, United States citizenship is a necessary element of proof under 18 U.S.C. § 241.

### E. *Proof of Violation of § 241*

In light of our conclusion, the question remaining is whether the government demonstrated that either Falcaro or Daoud was

an American citizen beyond a reasonable doubt. Khaled Daoud was a Jordanian citizen present in the United States on a non-immigrant visa at the time of his murder. The citizenship of Falcaro is less clear. Falcaro's wife testified that at the time of his death her husband resided in Nassau County, was licensed by New York State as an automobile dealer, and paid both state and federal taxes. By special verdict, the jury found Falcaro to be an American citizen based on this testimony.

■ The evidence as to both victims fails to satisfy the government's burden of proof. Daoud is a Jordanian citizen, not an American citizen. The jury found that Falcaro was a United States citizen, but on the evidence presented, no rational jury could have found Falcaro to be a citizen beyond a reasonable doubt. In light of the scant trial evidence on this issue, we hold that it was insufficient as a matter of law to support the convictions of appellants Borelli and Ustica under § 241. Accordingly, those convictions must be reversed.

### III *The Government's Alleged Misconduct*

In his 1983 sworn statement and grand jury testimony, a key government witness, Dominick Montiglio, failed to implicate his uncle, defendant Anthony Gaggi, in the car theft conspiracy. But at trial Montiglio testified extensively regarding Gaggi's involvement in the cars-to-Kuwait ring. When cross-examined by defense counsel about his earlier silence, Montiglio replied that he had lied to the grand jury. Montiglio also stated that he had told the government about his "perjury" a week before he testified at the trial. On re-direct, the witness stated that in his earlier interviews with the government he had hoped by his silence to protect his uncle.

Appellant Gaggi contends that the government violated its duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose

Montiglio's "perjury". Such failure, the defense maintains, led it to "open the door" to the damaging re-direct testimony of "protection-by-silence" that defense counsel would have avoided "at all costs". Gaggi further claims that the government knew that even Montiglio's explanation on re-direct was itself perjurious, and accordingly, that he is entitled to a new trial under *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

### A. The *Government's* Brady Obligations

Due process imposes upon the government an obligation to disclose material evidence favorable to an accused. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196. The duty to disclose encompasses not only exculpatory evidence, but also evidence that may be used to impeach a government witness. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). At the same time, "the prosecutor is not required to deliver his entire file to defense counsel." *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). A new trial is required only if the government withholds *material Brady* evidence. *Bagley,* 105 S.Ct. at 3384.

Appellant Gaggi does not claim that the prosecutor improperly withheld exculpatory or impeachment evidence. Rather, the complaint is that the prosecutor failed to disclose evidence to the defense which, had it been aware of, it would have used to avoid Montiglio's damaging explanation on re-direct. Thus, the claimed error was the government's failure to disclose information that might have been helpful to the defense in conducting its cross-examination of a government witness. *See Bagley,* 105 S.Ct. at 3381.

 As the government correctly observes, no *Brady* violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence. *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983);

*United States v. Stewart,* 513 F.2d 957, 960 (2d Cir.1975). Here, appellant Gaggi received before trial copies of all of Montiglio's statements and interviews with the government and his testimony before the grand jury. From these documents defense counsel was able to draw his own conclusions regarding Montiglio's prior silence. The only "fact" defense counsel did not have was Montiglio's own characterization of his testimony before the grand jury as "perjury". Yet, while the government has a duty to be forthcoming with favorable evidence, it is not required to draw inferences from that evidence which defense counsel is in an equal position to draw. It was obvious to defense counsel that Montiglio's sworn trial testimony was totally at odds with his earlier sworn statements. When the road to what defense counsel thinks is potential perjury is so plainly marked, the government need not supply a map. We see no violation by the government of its *Brady* obligations.

### B. The *Government's* Mooney *Duties*

Under *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed.2d 791 (1935) (per curiam), the prosecution has a duty to refrain from eliciting and relying upon testimony known to be perjurious. A new trial is required if the government uses perjured testimony that is uncorrected and reasonably likely to have affected the outcome. *United States v. Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397; *see Giglio,* 405 U.S. at 154, 92 S.Ct. at 766.

Appellant Gaggi argues that Montiglio's explanation that he remained silent in 1983 to protect Gaggi is perjurious because Montiglio actually inculpated his uncle in serious crimes during both his grand jury testimony and his government interview. Gaggi maintains that the government, aware of this fact, knowingly relied on this perjurious testimony. The government, on the other hand, asserts that Montiglio never told it before trial that he had committed "perjury" in his earlier statements. Further, the government insists that Montiglio's explanation is truthful.

■ Ruling on this question below, Judge Duffy declined "to make a determination as to the credibility of Dominick Montiglio as a matter of law," preferring to leave this as a fact for the jury. We agree with the district court's disposition of this question concluding, as it did, that there is insufficient evidence in the record to permit a finding of perjury as a matter of law. Accordingly, Gaggi's *Mooney* claim must fail.

## IV *Evidentiary Contentions*

Two evidentiary rulings of the district court are challenged. Such rulings are treated with deference on appeal, particularly with respect to questions of relevancy. *United States v. Southland,* 760 F.2d 1366, 1375 (2d Cir.) (Friendly, J.), *cert. denied,* —— U.S. ——, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985). Similarly, Fed.R.Evid. 403 gives the trial court broad discretion to weigh the probative value of evidence against its possible prejudicial effect and to determine whether, on balance, the evidence should be admitted or excluded. *United States v. Martinez,* 775 F.2d 31, 37 (2d Cir.1985). Because the trial court is in a superior position to evaluate the likely impact of the evidence, its evidentiary rulings are seldom overturned. *United States v. Esdaille,* 769 F.2d 104, 108 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985); *United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir. 1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

### A. *Borelli's New Jersey Conviction*

On August 4, 1981 in the United States District Court for the District of New Jersey, Borelli pled guilty to participation in a car-theft conspiracy. Judge Duffy admitted that judgment of conviction into evidence against Borelli without a limiting instruction. Borelli claims that use of the conviction is barred by the terms of his plea agreement. Alternatively he argues that the conviction was "other crimes" evidence, Fed.R.Evid. 404(b), that should have been accompanied by an instruction cautioning the jury against considering it as proof of his criminal propensities.

■ The first argument rests on a statement made by the District of New Jersey judge during a Rule 11 inquiry (Fed. R.Crim.P. 11(e)(1)(B)) to determine the court's acceptance of Borelli's plea. At one point that court stated:

Your plea or offer to plead, as well as anything else you say here under oath in your lawyer's presence cannot be used against you in any criminal proceeding other than the one we're concerned with right now. Do you understand that?

Borelli's contention that this statement barred Judge Duffy from admitting his New Jersey conviction into evidence miscomprehends the nature of a Rule 11 inquiry. The statement made in the District Court of New Jersey signifies that any statements made by Borelli during his guilty plea allocution could not be used against him in a subsequent criminal proceeding. It does not mean that the government is forever foreclosed from proving the fact of conviction from the public records. Because the trial evidence challenged in the instant case consisted only of the fact of conviction, not the minutes of the guilty plea allocution, its use was not barred by Borelli's plea agreement.

■ Again, as the government correctly points out, the court in New Jersey read from the bench the following excerpt from Borelli's plea agreement: "The agreement further states that it's limited to the U.S. Attorney's Office in this district and cannot bind other Federal, state or local prosecuting authorities. That is the limit of their jurisdiction." We enforce such clauses. *See, e.g., United States v. Persico,* 774 F.2d 30, 33 (2d Cir.1985). Thus, Judge Duffy did not abuse his discretion in allowing the New Jersey conviction into evidence.

■ Moreover, appellant Borelli was not entitled to a "similar acts" or "other crimes" limiting instruction. His conviction was not admitted to show his criminal propensity, but was instead direct evidence of his involvement in the larger conspiracy.

*See United States v. Paoli,* 603 F.2d 1029, 1035 (2d Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979) (testimony regarding narcotics transaction was not "other crimes" evidence, but direct proof of the conspiracy charged.). Accordingly, no limiting instruction was required.

### B. *The Scorney Murder*

Joseph Scorney, a car thief working with some members of the emerging cars-to-Kuwait scheme, was murdered by his accomplice Vito Arena in 1978. Defendant Turekian allegedly participated in the murder by serving as a "look-out", supplying the murder weapon, and assisting in the body's disposal. Testimony at trial revealed various possible reasons for Scorney's murder. For example, he had resisted the operation's change from a group of "local thieves" to a larger and more organized car theft ring, had threatened to kill another accomplice's children if anything happened to his car, was planning to "set-up" Arena so that Arena would be excluded from the operation, had refused to participate in the exportation of stolen cars and had caused tension and competition among the other street auto thieves by his presence.

The district court found the evidence concerning the Scorney murder relevant to the formation and early stages of the stolen car conspiracy because such testimony indicated that Scorney was murdered in order to "pave the road" for the participation of other more willing co-conspirators, such as Arena. Judge Duffy also concluded that the evidence's probative value outweighed the danger of unfair prejudice. *See United States v. Birney,* 686 F.2d 102, 106 (2d Cir.1982) (weighing these competing interests rests in sound discretion of trial court).

On appeal, Turekian argues that the district court's finding simply ignores Frederick DiNome's testimony that Scorney was "not killed over cars". Appellant maintains here, as he did below, that evidence of the murder was irrelevant to the stolen car charges on trial and that its admission was highly prejudicial. Even were this argument accepted at face value,

it would not dispel the existence of other testimony linking Scorney's murder to the conspiracy. Because some of the reasons for Scorney being killed are relevant to the conspiracy's formation and development, the district court did not act arbitrarily or irrationally in admitting evidence of Scorney's murder. *See United States v. Tramunti,* 513 F.2d 1087, 1118 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) (co-conspirator's murder admissible as evidence of the means taken in furtherance of conspiracy goals.).

Finally, Turekian claims that without the evidence of his participation in the Scorney murder there is insufficient independent, non-hearsay evidence of his membership in the car ring to render declarations of co-conspirators admissible against him under *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). As the evidence of Turekian's participation in the Scorney murder was properly admissible, we need not address this issue.

### V *The Jury Instructions*

During deliberations the jury requested additional instructions on aiding and abetting. The trial court responded by giving a supplemental charge that included examples of stolen car offenses. One such illustration focused on supplying illegal emission stickers. Because his alleged participation in the conspiracy consisted mainly of supplying illegal emission stickers, Rendini claims that this supplemental charge unduly prejudiced him before the jury. Similarly, Turekian, who was convicted of mail fraud for submitting fraudulent insurance claims to Aetna, now argues that the district court's instructions on mail fraud improperly allowed the jury to find him guilty without the requisite *mens rea.*

The effect of these challenged instructions is determined in light of "the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct.

396, 400, 38 L.Ed.2d 368 (1973). *Accord United States v. Gleason*, 616 F.2d 2, 14 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980).

■ Taking up Rendini's challenge, it has been said that examples paralleling the facts of the case under consideration by a jury are disfavored. *See, e.g., Gleason*, 616 F.2d at 14; *United States v. Dizdar*, 581 F.2d 1031, 1037 (2d Cir.1978). In the case at bar the example was highly analogous to the facts inculpating Rendini; as such it was more likely to be prejudicial than helpful, particularly when other non-prejudicial examples were available. Nonetheless, the error does not require reversal. Viewing the entire charge in context, the example given by the trial court loses any serious prejudicial effect. The jury was adequately advised of the law of aiding and abetting, and was warned repeatedly not to equate the examples given with the facts in the case before it. Moreover, other non-prejudicial examples were also provided. Thus, while the emission sticker example was ill-advised, whatever prejudice it may have occasioned was harmless when viewing the charge as a whole.

■ We also decline to upset Turekian's conviction. The mail fraud charge, viewed as a whole, was proper; in fact, it parallels the standard approved instructions on this subject. *See, e.g., United States v. London*, 753 F.2d 202, 206–07 (2d Cir.1985). The trial court in addition specifically instructed the jury that in order to find defendant Turekian guilty, it had to find that he "acted knowingly and willfully and with a specific intent to defraud." Hence, the charge properly instructed the jury on the requisite *mens rea* to convict the defendant for mail fraud.

## VI *The Sentences*

■ Appellants Ustica, Borelli, and Rendini seek to vacate their sentences. They assert that the district court sentenced them in a mechanistic manner, failing to exercise its sentencing discretion. Rendini also argues that his sentence constitutes cruel and unusual punishment. Yet, absent a claim that the sentence was illegally imposed, in excess of the applicable statutory maximum, based upon materially incorrect information, or the result of a constitutionally defective sentencing procedure, ordinarily we decline to interfere with the exercise of a trial court's sentencing discretion. *United States v. Slocum*, 695 F.2d 650, 657 (2d Cir.1982), *cert. denied*, 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983); *accord Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3046, 41 L.Ed.2d 855 (1974) ("[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end.").

■ Looking first at appellant Ustica's sentencing allocution, the trial court did not act mechanistically in imposing concurrent five and ten-year terms. It found that without Ustica's key role in the conspiracy as a car dealer "there could not have been a successful operation." Thus, it properly centered on Ustica's individual participation before sentencing him. Turning next to appellant Borelli, it was within the trial court's discretion to impose consecutive 10–year sentences for each of this defendant's convictions under § 2314. Given that each count represented a discrete segment of Borelli's criminal activities, it was appropriate to impose a separate term for each conviction. With regard to appellant Rendini, who also received a ten-year sentence for each § 2314 conviction, Judge Duffy particularly noted that Rendini supplied arms to his co-conspirators which were used in the commission of the homicides. Rendini's argument that his conviction and sentence resulted from *Pinkerton* principles of vicarious accessorial liability—even if true—is of no help to him. Consecutive sentences may properly be imposed upon such type of culpability. *See Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183, 90 L.Ed. 1489 (1946); *United States v. Crosby*, 314 F.2d 654, 657 (2d Cir.), *cert. denied*, 373 U.S. 923, 83 S.Ct. 1523, 10 L.Ed.2d 421 (1963). In setting Rendini's sentence, the district court also con-

sidered Rendini's flagrant dealing in narcotics from the courthouse telephones during his trial. Under these circumstances, the district court plainly did in fact consider the individual role played by each defendant and acted within its discretionary power in imposing sentence. *See Dorszynski v. United States*, 418 U.S. at 431, 94 S.Ct. at 3046.

Finally, we must decide whether appellant Rendini's sentence is so disproportionate that it violates the Eighth Amendment. *United States v. Ortiz*, 742 F.2d 712, 714 (2d Cir.), *cert. denied*, 469 U.S. 1075, 105 S.Ct. 573, 83 L.Ed.2d 513 (1984). The factors to be considered in evaluating proportionality include the gravity of the offense, the harshness of the penalty, and the sentences imposed on other criminals for the same crime. *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 3010, 77 L.Ed.2d 637 (1983). The Supreme Court has warned that we should not substitute our judgment for that of the sentencing court, but when applying the Eighth Amendment to decide only whether the sentence is within constitutional limits; a review that rarely requires extended analysis. *Solem*, 463 U.S. at 290 n. 16, 103 S.Ct. at 3009 n. 16.

█ In considering the gravity of Rendini's offense, the violent nature of the car theft conspiracy, the danger it represented to the community, and the continued disrespect for the law Rendini exhibited by engaging in narcotics transactions during his trial are all strongly persuasive factors. Regarding the claimed harshness of the penalty, Rendini did receive the maximum statutory prison term, but he was not fined to the statutory limit. Although a review of similar sentences for the same crime reveals that his sentence is longer than the average sentence imposed in similar cases, the heavier sentence is properly justified by the particularly violent nature of the conspiracy. *See Ortiz*, 742 F.2d at 717 (a sentence which was double the average sentence imposed was not disproportionate). In sum, there is no constitutional basis for reversing the sentence imposed inasmuch as it falls within statutory limits and is not grossly disproportionate to the seriousness of the offense.

## CONCLUSION

The judgments of conviction appealed from are all affirmed, except for appellant Ustica's and appellant Borelli's convictions under 18 U.S.C. § 241 which are reversed.

Judgment affirmed in part, reversed in part.

## APPENDIX "A"

| DEFENDANTS | INDICTMENTS | SENTENCES |
|---|---|---|
| GAGGI | § 371 Conspiracy<br>—Convicted—<br><br>§ 2314 Counts<br>(Acquitted on all<br>Counts) | 5 years (§ 371)<br>$10,000 fine<br><br>— |
| USTICA | § 371 Conspiracy<br>§ 241 Civil Rights Count<br>§ 2314 Counts<br><br>—Convicted on all<br>Three Charges— | Concurrent Terms of<br><br>Life (§ 241)<br>10 years (§ 2314)<br>5 years (§ 371) |
| LaFROSCIA | § 371 Conspiracy<br>—Convicted—<br><br>§ 2314 Counts<br>(Acquitted) | 5 years (§ 371)<br><br><br>— |
| BORELLI | § 241 Civil Rights Count<br>§ 2314 Counts<br><br>—Convicted on Both<br>Charges— | Consecutive Terms<br>of<br><br>Life (§ 241)<br>+150 (§ 2314)<br>(10 yrs per count) |
| RENDINI | § 371 Conspiracy<br>§ 2314 16 Counts<br><br>—Convicted on Both<br>Charges— | Consecutive Terms<br>of<br><br>5 years (§ 371)<br>+160 (§ 2314)<br>$85,000 fine<br>(10 yrs per count) |
| TUREKIAN | § 371 Conspiracy<br>§ 1341 Mail Fraud<br><br>—Convicted on Both<br>Charges—<br><br>§ 2314 Counts<br>(Acquitted on all<br>Counts) | Concurrent Terms of<br><br>5 years (§ 371)<br>(Mail Fraud)<br><br><br>— |