06-0638-cr, 06-0744
United States v. Elfgeeh

Sack, Circuit Judge, concurring in part and dissenting in part:

I concur for the most part in the judgment of the Court and the opinion of Judge Kearse. I respectfully dissent in part, however, because I would vacate the judgment of conviction of Aref Elfgeeh and remand the case against him to the district court for further proceedings. I do not think that his conviction comports with principles of Due Process for two reasons, one having to do with extensive and particularly prejudicial publicity (Part I, below), and the other with the district court's instructions to the jury as to the state of Aref's knowledge needed to permit a conviction (Part II, below). That the former requires a good deal more explication than the latter does not mean that I view the latter as is either a less important, or a less persuasive, reason for vacatur of the judgment against Aref.

I. Prejudicial Trial Publicity

A. The First Indictment of Abad and His Guilty Plea

Immediately after the 9/11 attacks, President Bush "announced that the United States would make no distinction between those who committed t[errorist] acts and those who harbor[ed] t[errorists]." Global Relief Found., Inc. v. New York Times Co., 390 F.3d 973, 975 (7th Cir. 2004) (internal quotation

marks omitted). "A few days later, the President stated that the United States would also focus on non-governmental organizations which served as fronts or as funding mechanisms for terrorist organizations." Id.

Abad Elfgeeh operated an informal money-transmitting business -- called, in Arabic, a "hawala"[1] -- from his ice cream store in Park Slope, Brooklyn. The hawala was used largely by members of Brooklyn's Yemeni-American community to transfer money abroad. On February 3, 2003, a four-count indictment returned by a grand jury sitting in the United States District Court for the Eastern District of New York charged Abad Elfgeeh -- not his nephew Aref -- with various violations of federal law in connection with his operation of the hawala.

In Count One of the indictment, the grand jury alleged that between January 1995 and October 2001, Abad had conspired to, inter alia, conduct a business, the hawala, "knowing that . . . [it] was an illegal money transmitting business" and that it affected interstate or foreign commerce, in violation of 18 U.S.C. § 1960(a) (1994). In Count Two, he was charged with, inter alia, conducting the business in violation of that statute and 18 U.S.C. § 3551 et seq. In Count Three, the grand jury charged that between November 2001, when a new version of section

---

[1] "Hawalas" have been defined as "informal money-lending networks common in the Arab world." Global Relief Found., Inc. v. New York Times Co., 390 F.3d 973, 976 (7th Cir. 2004).

1960(a) had become effective, and January 2003, Abad conspired, inter alia, to conduct an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960(a) (2001). In Count Four, the grand jury asserted that during the same time period, Abad, inter alia, conducted such a business.

More than eight months later, on October 8, 2003, Abad entered a plea of guilty to all four counts in the indictment before a magistrate judge. The magistrate judge conducted a hearing pursuant to Federal Rule of Criminal Procedure 11(b), which requires that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). The magistrate judge then recommended that the district court accept the plea.

Seven months later, on May 11, 2004, however, the district court (Charles P. Sifton, Judge) rejected the magistrate judge's recommendation. The court observed:

> [T]he . . . proceedings before the Magistrate Judge make[] clear that there was no factual basis for a finding that [Abad] Elfgeeh had engaged in either of the two conspiracies . . . . [N]obody's guilt of any offense other than Mr. Elfgeeh's own was even discussed. So there was no allocution under oath or otherwise by Mr. Elfgeeh to his participation in an illegal agreement with at least one other individual to commit the crimes with which he is charged in Counts One and Three.

Tr. of Proceedings at 3, United States v. Elfgeeh, No. CR 03-133, (E.D.N.Y. May 11, 2004).

B.  The Superseding Indictments

On June 9, 2004, several weeks after Abad's guilty plea was rejected, the grand jury returned a superseding indictment. It charged not only Abad, but also his nephew, Aref, in connection with the operation of the hawala.

This first superseding indictment noted by way of introduction that before November 1, 2001, an "illegal money transmitting business," as defined in 18 U.S.C. § 1960(a), was a "money transmitting business . . . intentionally operated without an appropriate money transmitting license" in a state in which doing so was a crime.  Indictment dated June 9, 2004 at 1, United States v. Elfgeeh, No. CR 03-133, (E.D.N.Y. June 9, 2004) (emphases added).  Beginning on November 1, 2001, however, Congress substituted for the phrase "illegal money transmitting business" in the statute the phrase "unlicensed money transmitting business," which included "any money transmitting business . . . operated without an appropriate money transmitting license" if criminal penalties were assessed by the state for the lack of such a license.  Id. at 1-2 (emphasis added).  Thus, in the new, post-9/11 version of the statute, the requirement that the defendant "intentionally" operate the business without a state license was omitted.  See USA PATRIOT ACT of 2001, Pub. L. No. 107-56, § 373, 115 Stat. 272, 339 (amending 18 U.S.C. § 1960(a)).

In Count One of the first superseding indictment, the grand jury then alleged that between January 1995 and October

2001, Abad had conspired, <u>inter alia</u>, to conduct a business "knowing that the business was an illegal money transmitting business" in violation of 18 U.S.C. § 1960(a) (1994). <u>Id.</u> at 2-4. In Count Two, the grand jury charged that, during the same time period, Abad, <u>inter alia</u>, conducted such a business in violation of that statute and 18 U.S.C. § 3551 <u>et seq.</u> <u>Id.</u> at 4. In Count Three, the grand jury charged that between November 2001 and January 2003, Abad <u>and his nephew Aref</u> conspired to, <u>inter alia</u>, conduct an <u>unlicensed</u> money transmitting business in violation of 18 U.S.C. § 1960(a) (2001). <u>Id.</u> at 4-6. In Count Four, the grand jury asserted that during the same time period, <u>inter alia</u>, Abad <u>and Aref</u> conducted such a business. <u>Id.</u> at 6. Thus, in both the original indictment and the first superseding indictment, Abad was charged with violation of both the 1994 and 2001 versions of the statute. In the first superseding indictment, Aref,[2] was also charged, but with violation of the 2001 version of the statute only. He was thus not accused of "intentionally" operating the business without a state license.

---

   [2] Aref, with the government's assent, ultimately received a minor role downward adjustment to his sentence. He had been referred to by the government at trial as a "shlepper," Trial Tr. at 1006, <u>United States v. Elfgeeh</u>, No. CR-03-0133 (E.D.N.Y. Sept. 20, 2005), although the term "gofer" might have been closer to the mark. ("According to Leo Rosten's book 'The Joys of Yiddish,' some of the meanings of the word 'schlepper' are: 'drag, jerk, a maladroit performer, unkempt, untidy.'" Samuel Chiel, Letter to the Editor, N.Y. Times, Dec. 2, 1994. A "gofer" is defined in Merriam-Webster's Online Dictionary as an "employee whose duties include running errands." http://www.m-w.com/dictionary/gofer (last visited Jan. 13, 2008).).

On September 15, 2004, the grand jury returned a second superseding indictment . See Indictment dated September 15, 2004, United States v. Elfgeeh, No. CR 03-133, (E.D.N.Y. Sept. 15, 2004). The indictment added a new Count Five charging only Abad with "structuring," i.e., breaking amounts of currency in excess of $10,000 into smaller amounts and depositing the smaller amounts into an account with a financial institution -- presumably for the purpose of evading federal reporting requirements, id. at 8 -- in violation of 31 U.S.C. § 5324(a).

Unlike his guilty plea to the first indictment, Abad Elfgeeh pleaded not guilty to both superseding indictments. So did his nephew Aref.

## C. Background: Post-9/11 Prosecution of Terrorists and Those Providing Funding to Them

Prominently connected with the prosecution of Abad Elfgeeh was the high-profile investigation and prosecution of Mohammed Al-Moayad -- self-described as "Osama bin Laden's Sheik" -- and his alleged co-conspirator, Mohammed Zayed. The two were convicted on March 10, 2005, after a five-week jury trial before Hon. Sterling Johnson -- the same district judge who presided over the Elfgeehs' case -- for conspiring and attempting to provide material support to Hamas and conspiring to support Al-Qaeda.[3] The Al-Moayad prosecution and the events surrounding it

_____

[3] The judgments of conviction were entered on August 1, 2005 and September 15, 2005, respectively. Al-Moayad was

(including a key witness's apparent attempt to immolate himself in front of the White House) were widely reported by and discussed in the media.[4]

Abad Elfgeeh apparently had connections to Al-Moayad, and the government plainly harbored suspicions that his hawala had been used to funnel money abroad in support of terrorist-related activity. But the government never purported to be able to prove any such link. No such charge was contained in the indictment. Aref Elfgeeh was accused only of the crime of operating and conspiring to operate an "unlicensed" money-transmitting business.

As the majority points out, the district court recognized that in light of the circumstances under which the Elfgeehs' trial was conducted, it had a fundamental responsibility to keep issues of terrorism out of the trial. It sought to ensure that the jury would consider the charges that were actually made against the Elfgeehs, essentially financial in nature, and not the incendiary and uncharged accusation of their

---

sentenced to 75 years in prison, Zayed to 45. <u>See</u> Government's Br. in <u>United States v. Al-Moayad</u>, 2d Cir. No. 05-4186. Appeals from the convictions were argued before this Court on November 26, 2007.

[4] Al-Moayad's trial was covered by the local news media on a regular basis. I count fourteen articles about the trial in <u>The New York Daily News</u> during that period; twelve in <u>Newsday</u>; eight in <u>The New York Post</u>; and seventeen in <u>The New York Times</u>.

involvement in, facilitation of, or support for, Islamic terrorism.

D. The Trial Publicity

On September 11, 2005, the city and country marked the fourth anniversary of the Al-Qaeda attacks. The commemoration was, of course, front page news in New York the following day. See, e.g., Michael Wilson, Marking 9/11 While Mourning a Fresher Loss, N.Y. Times, Sept. 12, 2005, at A1. The Elfgeeh jurors were sworn the same day, September 12, in the Eastern District courthouse, some two miles from "ground zero." Opening arguments were held the next day, Tuesday.

As the majority opinion explains in some detail, the Elfgeeh trial itself received substantial press coverage. The publicity culminated on the third day of trial, September 14, see ante at **[pp. 21-25]**, in the principal New York tabloids: Newsday,[5] The New York Post, and The New York Daily News.[6] The

---

[5] Newsday's home base is in Melville, Long Island, which is located in Suffolk County, Long Island, New York, and its principal circulation is in Suffolk and Nassau counties, the two counties on Long Island that are not part of New York City, and Queens County, which is part of the city. All are located in the Eastern District of New York.

[6] These three papers had a combined daily circulation in excess of 1.5 million copies. According to Audit Bureau of Circulation figures reported by the BurrellesLuce media monitoring service, in 2005, The New York Daily News, The New York Post, and Newsday ranked sixth (708,773), seventh (643,086), and twelfth (459,305), respectively, in daily circulation among United States newspapers. See http://www.burrellesluce.com/top100/2005_Top_100List.pdf (last visited Jan. 22, 2008).

stories that day strongly suggested a link between the

prosecution of the Elfgeehs and other terrorism prosecutions.

Worse, they specifically questioned the district court's ruling

that the Elfgeehs' prosecution was not a terrorism prosecution,

and the trial judge's insistence that the issue of terrorism be

avoided.  The Post, for example, asked:

> Was Abad Elfgeeh, upstanding American
> citizen, financing terror through ice cream?
> You may never know because federal jurors may
> never hear the "T" word spoken aloud.[7]

The articles were indisputably, intentionally inflammatory.  And

as the majority observes, "There can be little doubt that in the

wake of September 11, 2001, evidence linking a defendant to

terrorism in a trial in which he is not charged with terrorism is

likely to cause undue prejudice."  Ante at **[p. 43]**.

> The articles plainly had the potential for
> unfair prejudice.  Each referred to the
> Elfgeehs' trial and made pointed references
> to, inter alia, terrorism and/or al Qaeda; in
> addition they described evidence that the
> jury would not be allowed to see or hear at
> trial; and two of the articles stated that
> Abad had previously pleaded guilty to the
> charges on which he was now being tried.

Id. at **[p. 50]**.  The articles threatened to nullify the district

court's requirement that no one suggest to the jury that the

prosecution was terrorism-related.

E.  Circuit Law on Prejudicial Trial Publicity

---

[7]  Andrea Peyser, "Trial Serves Up Some Really Nutty Buddies," New York Post, Sept. 14, 2005, at 9.  A copy of the text of the article is attached hereto.

The difficulty of the challenge to courts in ensuring that a criminal defendant enjoys Due Process even while the press is free to report on the defendant's trial and the public is thus able to learn about it as it unfolds, has long been understood. See, e.g., Hans A. Linde, Fair Trials and Press Freedom: Two Rights Against the State, 13 Willamette L. Rev. 211, 214 (1977). The Supreme Court has for many years recognized that in some cases trial publicity can so pollute criminal proceedings and thereby abridge the ability of the defendant to receive a fair trial that only remand and retrial can remediate the damage. See, e.g., Estes v. Texas, 381 U.S. 532 (1965) (holding that televising the trial, over defendant's objection, violated Due Process); Rideau v. Louisiana, 373 U.S. 723 (1963) (holding that television broadcast of the defendant's pre-trial confession violated Due Process). In Sheppard v. Maxwell, 384 U.S. 333 (1966), the Court addressed, among other things, prejudicial publicity in the course of a criminal trial.

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances. . . . If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial

> measures that will prevent the prejudice at
> its inception.

Id. at 362-63; see also Neb. Press Ass'n v. Stuart, 427 U.S. 539,

553-554 (1976) (noting that judges have a duty to protect

defendants from prejudicial publicity) (quoting Sheppard, 384

U.S. at 362-63).

Pervasive trial coverage, of concern to the Stuart and

Sheppard Courts, is hardly unknown in this Circuit.  "It is not

an uncommon occurrence for a notorious trial held in Metropolitan

New York to engender extensive publicity."  United States v.

Gaggi, 811 F.2d 47, 51 (2d Cir.), cert. denied, 482 U.S. 929

(1987).  For that reason, more than twenty-five years ago -- the

year following the Supreme Court's decision in Nebraska Press

Association -- we established the appropriate procedures to be

taken by a district court in the face of prejudicial trial

publicity like that which occurred in the Elfgeehs' case:

> The guidelines to be followed by a district
> court confronted with the problem of
> publication or broadcast of information
> concerning an ongoing criminal trial have
> been indicated by us.  First the court must
> decide whether the publicity contains
> potentially prejudicial information, and
> whether the members of the jury might have
> been exposed to it.  If the broadcast or
> article contains no information beyond the
> evidence in the case, or if the information
> is clearly innocuous or the possibility of
> the jury's exposure to it is remote, further
> inquiry may not be necessary.  If, however,
> the court determines that the article or
> broadcast has a potential for unfair
> prejudice, then an initial inquiry of the
> jury is necessary to ascertain whether any of
> its members have been exposed to the

> information. Any juror who responds that he
> or she has been so exposed should be examined
> individually, out of the presence of the
> other jurors, to determine the extent of the
> exposure and its effect on the juror's
> attitude toward the trial. This
> precautionary procedure should permit the
> court to determine what further steps, if
> any, are required to insure that the trial
> proceeds fairly.

United States v. Lord, 565 F.2d 831, 838-39 (2d Cir. 1977)

(emphasis added; citations and footnote omitted) (reversing a

conviction because of, inter alia, the district court's failure

to take correct protective measures in the face of prejudicial

publicity during a jury trial).

> As we restated the rule ten years later:

> The simple three-step process is, first, to
> determine whether the coverage has a
> potential for unfair prejudice, second, to
> canvass the jury to find out if they have
> learned of the potentially prejudicial
> publicity and, third, to examine individually
> exposed jurors -- outside the presence of the
> other jurors -- to ascertain how much they
> know of the distracting publicity and what
> effect, if any, it has had on that juror's
> ability to decide the case fairly.
> Ultimately, the trial judge must examine the
> special facts of each case to determine
> whether the jurors remained impartial.
> Absent a clear abuse of the trial court's
> discretion, its finding that the jury was
> impartial should be upheld.

Gaggi, 811 F.2d at 51 (internal quotation marks and citations

omitted).

## F. Aref's Motion To Poll the Jurors

The majority opinion describes in detail the district

court's attempt to neutralize the prejudicial publicity in the

Elfgeehs' case.  See ante at **[pp. 25-31].**  To summarize:  On the morning of the day of the appearance of the articles in question -- Wednesday, September 14 -- the principal Assistant United States Attorney prosecuting the case called the court's attention to the articles in question, asking the court to admonish the jury to avoid press accounts of the trial.  The court did so.

The same afternoon, Aref's counsel addressed the articles and their potential impact at some length.  He moved for a mistrial or, in the alternative, for the court to interview the jurors to see whether they had read the articles, and also to admonish them.  Abad's counsel worried aloud, however, "Sometimes when you have a situation like this, you make it worse [by polling the jurors]."  The court agreed, leaning toward an admonishment only.  Aref's counsel nonetheless asked that the court ask the jury "as a group" whether anyone had read one of the articles.   The district judge, noting that he had not seen the articles himself, said, "There might be some who have not read it, you'll call their attention to it," and, after more colloquy, concluded, "I think what I should do at the end of the day, when we get ready to go home, to mention it again as opposed to right after lunch."  To this, Aref's counsel responded: "Again, I have made my request.  My request is on the record." As the majority recognizes, Aref's counsel, by requesting that the jurors be polled individually, and then asking that they be polled as a group, "eventually made a proper request."  Ante at

**[p. 49]**  At the end of the trial day, the court instructed the jury to avoid media reports, and that the case would be determined solely on the evidence presented at trial.

The trial continued five days later, on Monday, September 19.  Abad's lawyer raised the publicity issue again then, but it was in the form of a motion <u>in limine</u> about issues as to which Abad would not have to testify.  The motion was denied.  The district court then reviewed one of the offending articles, apparently for the first time.  The court repeated its September 14 admonishment to the jury.

G.  <u>The Insufficiency of the District Court's Admonishment</u>

The majority states: "If [the court gave a standard admonition not to read or watch anything about the trial], we may presume, in the absence of any indication to the contrary, that the jurors have followed the court's instructions and have rendered their verdict solely on the basis of the evidence at trial."  <u>Ante</u> at **[p. 48]**.  In <u>Gaggi</u>, however, we opined, on just that point, that a district court "should not rely solely on repetitive admonitions when widespread publicity created a strong possibility that some jurors might have been exposed to prejudicial publicity."  <u>Gaggi</u>, 811 F.2d at 52 (citing <u>Lord</u>, 565 F.2d at 838).  And in <u>Lord</u>, we found it an abuse of discretion for the district court to rely solely on such an admonition. Where articles about the trial appeared on the front page of the

second section of the primary city newspaper, Lord, 565 F.2d at 838 n.6, we said:

> The widespread availability of the newspapers as well as the prominent position occupied by the articles, created a strong possibility that some jurors might have been exposed to the irrelevant and prejudicial matter in the publicity. Under such circumstances it is not enough to assume that jurors will faithfully observe general cautionary instructions, in view of some experience to the contrary.

Id. at 838 (emphasis added; footnote and citation omitted); cf. Krulewitch v. United States, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction.").

The analysis we employed in Lord should be applied here.

H.  An Aside as to the Likelihood of Juror Exposure

The majority, after concluding that the district court did not abuse its discretion, says, "The articles were clearly prejudicial, but it is hardly clear that the jurors would have seen them. The judge had not seen them; Abad's attorney has not seen them; and we assume that Aref's attorney had not seen them since he said nothing during the first discussion of the articles (and at lunchtime did not even recall that the court had instructed the jury that morning to avoid such articles)."

Ante at **[p. 53]**.  I have considerable difficulty with that inference.

This was the first day of testimony in a high-visibility criminal case.  Articles of similar prejudicial import appeared in all three major tabloids serving the Eastern District of New York that morning.  Counsel and the court were deeply engaged in trial preparation; it is therefore not surprising that they were not reading press accounts.  But I would surmise that jurors, while commuting to the courthouse or waiting to enter the courtroom, and having been warned not to discuss the case among themselves, would be very likely to read the papers.  The chances seem to me to be rather remote that no juror saw or heard about the contents of any of the four articles about the case on which they were sitting -- court admonishment to the contrary notwithstanding.  It was perhaps for similar reasons that the Gaggi and Lord courts thought such court instructions to be insufficient.

I.  Waiver

The majority observes that: "Had there been no expression of concern by Abad's attorney following the government's suggestion that the court pose a general question to the jury, or had Abad joined in Aref's eventually appropriate motion for such questioning, the court should have followed the Gaggi procedures and asked the jurors, as a group, whether any of them had been exposed to the articles."  Ante at **[p. 52]**.  The

opinion goes on to refer to the divergent views of Aref and Abad and concludes that in light of that divergence, the "trial judge had discretion to decide whether or not to put the question to the jury." <u>Ante</u> at **[p. 53]**.

It is a fair reading of the transcript to conclude, as the majority does, that counsel for Abad preferred for the court not to poll the jury. His client is reasonably bound by that. But Aref was not represented by the same counsel, nor were his interests necessarily aligned with Abad's. And, in a situation where there was an extraordinary danger of actual prejudice, I think that our case law strongly suggests that his request for the jury to be polled should have been honored. I think the failure to do so on the facts of this case was a "clear abuse of the trial court's discretion." <u>Gaggi</u>, 811 F.2d at 51.

This is not a purely theoretical matter. I fear that there is a substantial danger that Aref, at best a third-string player in the scheme for which he was indicted, was convicted because he was a member of the Yemeni community, and the jury suspected that the prosecution was, at bottom, about terrorism and Al Qaeda, supported by publicity to that effect. I do not see how, with respect to Aref, the error can be said to be harmless.

<u>Lord</u> and <u>Gaggi</u> do not establish immutable legal requirements for dealing with potentially prejudicial trial publicity. As the majority points out, "A district court's

decision regarding juror impartiality is reviewed for abuse of discretion and deserves deference." <u>Ante</u> at **[p. 47]** (quoting <u>United States v. McDonough</u>, 56 F.3d 381, 386 (2d Cir. 1995) (internal quotation marks omitted)).  But for the foregoing reasons, and in light of the analysis by the <u>Lord</u> and <u>Gaggi</u> courts and their exhortations, I would conclude that it was an abuse of discretion for the district court not to employ those procedures under the unusual circumstances presented here.

## II.  Instruction on Knowledge Requirement

The majority concludes, rightly in my view:

> In the present case, Aref asked the court to instruct the jury, <u>inter alia</u>, that "[t]he government must also prove beyond a reasonable doubt that the defendant knew that the business was unlicensed."  The trial court should have included such an instruction in its charge to the jury.

<u>Ante</u> at **[p. 57]** (alteration in original).  The majority nonetheless affirms the judgment of the district court, essentially on the basis of harmless error.  I disagree.

The majority first notes that only one sentence of the disputed jury instruction was erroneous, and that that sentence was surrounded by proper explanations of the knowledge requirement under the amended statute.  The majority concludes: "In sum, viewing the instructions as a whole and the nature of the evidence presented at trial, we are persuaded beyond a reasonable doubt that the error in the instructions was harmless because the jury would have reached the same verdicts had it been

instructed not to convict these defendants unless it found they knew the business was unlicensed." Ante at **[p. 62]**.

I agree that Abad's conviction should stand notwithstanding this error. He was convicted on the more stringent standard that preceded the amendment of the statute effective November 1, 2001. There was ample evidence that he knew his own money-transmitting business was unlicensed. But I disagree with that analysis as it pertains to Aref.

After recognizing that the evidence of Aref's knowledge that the business was unlicensed "was more circumstantial," the majority states nonetheless: "[W]e likewise conclude beyond a reasonable doubt that the instructional error did not contribute to the verdict against him." Ante at **[p. 61]**. It seems doubtful to me that circumstantial evidence of Aref's knowledge of the intricacies of an operation run by his uncle is "overwhelming." The majority discusses the circumstantial evidence of the "furtiveness" of the money-transmitting operations. See ante at **[pp. 61-62]**. But furtiveness does not necessarily amount to knowledge. For all the evidence discloses, Aref was simply doing what his uncle instructed him to do, trusting that his uncle knew what was proper. As the opinion recognizes, a hawala is not illegal. It was the failure first to obtain a license for the business that was the crime. And Abad had been operating the hawala for many years before Aref became involved. Without any direct evidence to the contrary, a properly instructed jury might

well have inferred that Aref believed his uncle must have licensed the business, particularly in light of the fact that he displayed other business licenses in his store.

I am not convinced beyond a reasonable doubt that Aref knew that Abad had failed to obtain a state license for the hawala.

\*\*\*

For the foregoing reasons, I would vacate the judgment of conviction as to Aref and remand the case against him to the district court for further proceedings.

**EXHIBIT TO OPINION OF JUDGE SACK**


**TRIAL SERVES UP SOME REAL NUTTY BUDDIES**

BY DAY, Abad Elfgeeh posed as an ice-cream peddler - a jolly pillar of the community and unofficial "mayor" of his Yemeni neighborhood in Brooklyn.

But behind the scenes, Elfgeeh used his Park Slope sweet shop to funnel cash to the Middle East, say the feds. Wads of it - some $20 million was scooped out and shipped over, in small chunks that no one was supposed to notice.

When Elfgeeh was arrested, Attorney General John Ashcroft went so far as to say that this case proves "the FBI can better prevent terrorism and save American lives."

Was Abad Elfgeeh, upstanding American Citizen, financing terror through ice cream? You may never know because federal jurors may never hear the "T" word spoken aloud.

Elfgeeh is standing trial on charges he illegally transferred money to Yemen - which could put him away for 15 years. But prosecutors agreed that mentioning terror might "prejudice" the jury, a source told me. This surreal trial gets even stranger, when you learn how it all came about.

On Elfgeeh's legal team in Brooklyn federal court is one Burton Pugach. He is a jolly paralegal and former lawyer who was disbarred more than 40 years ago after he was convicted of hiring three men to throw lye in the face of a girlfriend who tried to leave him. She was blinded permanently. Then he married her.

Then, eight years ago, he was accused of threatening to maim a second woman.

"I only asked someone to beat her up," Pugach, 78, said about his wife, who for some reason remains wed to him.

So now he wants to fight for fellow victims of the system.

Elfgeeh actually pleaded guilty to the charges against him two years ago. But then he met Pugach. He pleaded "not guilty" and now faces up to 15 years in prison if convicted. Pugach is convinced his client will walk. These two deserve each other.


Andrea Peyser, "Trial Serves Up Some Real Nutty Buddies," <u>New York Post</u>, Sept. 14, 2005, at 9.